IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Harrisonburg Division

| | | |
|---|---|---|
| DANIEL C., | ) | |
| Plaintiff, | ) | Civil Action No. 5:23-cv-00006 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY, | ) | By:    Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Daniel C. asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision terminating his disability insurance benefits ("DIB") under Title

II of the Social Security Act, 42 U.S.C. §§ 401–434, after two prior federal court remands under

the fourth sentence of 42 U.S.C. § 405(g). Compl., ECF No. 2; *see* Administrative Record ("R.")

878–79, 2291, ECF No. 18. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B).

I. Introduction

In November 2010, Virginia Disability Determination Services ("DDS") found that

Daniel was disabled by severe mental and physical impairments beginning August 27, 2006. *See*

R. 117. In October 2014, DDS notified Daniel that his disability had "ceased" as of October 6,

2014, and that his DIB payments would stop effective December 31, 2014. An Administrative

Law Judge ("ALJ") issued written decisions affirming that determination in June 2016 and again

in August 2020, but both decisions were ultimately vacated and remanded to the agency for

rehearing. *See* R. 20–35, 856–85, 2243–75, 2291, 2294–95. The ALJ's third written decision

dated July 28, 2022, is the Commissioner's final decision that Daniel's prior disability has ended

and that he has not become disabled again. *See* R. 2146, 2156–90.

This ALJ relied on two independent regulatory grounds to terminate Daniel's benefits. R.

2190; *see also* R. 2143–45. First, he concluded that Daniel's "disability ended in January 2015,

1

the first month in which [Daniel] engaged in SGA after the completion of his TWP."[1] R. 2190

(citing 20 C.F.R. § 404.1592a(1)); *see* R. 2158–62 (substantial gainful activity, trial work period,

and related analysis). "Alternatively," the ALJ concluded that Daniel's "disability ended on

October 6, 2014, based on medical improvement and the ability to perform work in the national

economy." R. 2162; *see* R. 2162–86 (medical improvement and related analysis); R. 2190 (citing

20 C.F.R. § 404.1594(f)(8)). The Commissioner may rely on either ground to terminate Daniel's

DIB payments—but only if this ALJ applied the correct legal standard and substantial evidence

supports his factual findings. *Duvall v. Califano*, 569 F.2d 820, 821 (4th Cir. 1978) (affirming

termination of disability benefits where substantial evidence supported only one of the two legal

grounds in ALJ's decision).

Daniel's brief raises arguments challenging both grounds. *See generally* Pl.'s Br. 43–48

(ALJ failed to consider SGA factors), 49–58 (medical improvement), 58–69 (current mental

RFC), R. 69–77 (current physical RFC), 78–84 (current symptoms). The Commissioner's brief

focuses on the first ground, arguing that Daniel's disability ended in January 2015 because that

was the first month in which he "work[ed] at the SGA level" after receiving DIB payments for at

least twenty-four months. Def.'s Br. 6; *see id.* at 6–12 (discussing 20 C.F.R. § 404.1575(e)); *id.*

at 13 ("Plaintiff's arguments regarding medical improvement are moot because . . . he began

working at SGA in January 2015."), ECF No. 24. Alternatively, the Commissioner argues that

this ALJ properly determined Daniel's *previous* impairment(s) medically improved between

November 8, 2010, and October 6, 2014, and that such improvement was related to Daniel's

ability to work. *See id.* at 13–14 (citing R. 2162–63, 2168–88); 20 C.F.R. § 404.1594(f)(3)–(5)).

---

[1] "SGA" and "TWP" are short for "substantial gainful activity" and "trial work period," respectively. *See*
20 C.F.R. §§ 404.1571, 404.1592. Daniel does not challenge this ALJ's findings or conclusions about the
trial work period, R. 2158–59. *See generally* Pl.'s Br. 43–84, ECF No. 17.

The Commissioner's brief does not defend the merits of this ALJ's conclusions that Daniel's *current* physical and mental impairments did not prevent him from doing SGA-level work from October 6, 2014, through July 28, 2022. R. 2188–90; *see* 20 C.F.R. § 404.1594(a), (f)(6)–(8).

Having considered the administrative record, the parties' briefs, and the applicable law, I am constrained to conclude that substantial evidence does not support any of the reasons this ALJ gave for finding *either* that Daniel's "disability ended in January 2015" because he did SGA-level work in January 2015, R. 2159–62, 2190, *or* that Daniel could have sustained light exertional SGA-level work after his prior "disability ended on October 6, 2014,"[2] R. 2162, 2189–90. *See Patterson v. Bowen*, 839 F.2d 221, 225 ("We must . . . affirm the ALJ's decision only upon the reasons he gave."). The Court does not conclude that relevant evidence in Daniel's record cannot adequately support those (or similar) findings—only that this ALJ's decision does not "build an accurate and logical bridge from the evidence to [his] conclusions." *Arakas v. Comm'r Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020); *see also Fox v. Colvin*, 632 F. App'x 750, 755 (4th Cir. 2015) ("[I]t is not our role to speculate as to how the ALJ applied the law to its findings[,] . . . to hypothesize the ALJ's justifications that would perhaps find support in the record," or "to engage in . . . fact-finding exercises in the first instance" (cleaned up)). Accordingly, I respectfully recommend that the presiding District Judge reverse Commissioner's

---

[2] While the record adequately supports this ALJ's reasons for finding that Daniel's once-disabling mental impairments saw medical improvement related to his ability to work by October 6, 2014, *see* R. 2168–75, that finding addresses only part of the eight-step "continuing disability" standard. *See* 20 C.F.R. § 404.1594(a), (f)(3)–(4). The Commissioner "must also show that [Daniel is] *currently* able to engage in [SGA] before [it] can find that [he is] no longer disabled." *Id.* § 404.1594(a) (emphasis added). This ALJ failed to explain his conclusion that Daniel's severe knee impairment(s) would not have prevented him from doing "light" exertion work on a regular and continuing basis from October 2014 through July 2022. R. 2175, 2186–89; *see generally* Pl.'s Br. 69–84. Accordingly, I do not address Daniel's other RFC challenges relating to his severe mental impairments. *See* Pl.'s Br. 58–69.

final decision dated July 28, 2022, and remand Daniel's case for rehearing under the fourth

sentence of 42 U.S.C. § 405(g).

## II. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see Dowling v.*

*Comm'r of Soc. Sec. Admin.*, 986 F.3d 377, 382–83 (4th Cir. 2021); *Hines v. Barnhart*, 453 F.3d

559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting

evidence, make credibility determinations, or substitute [its] judgment" for that of agency

officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the

merits of the Commissioner's final decision asks only whether the Administrative Law Judge

("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's

factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F.

Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is

"more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount

of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review

considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera*

*Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir.

1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence

allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434

F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not

binding if it was reached by means of an improper standard or misapplication of the law."
*Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to make an "initial determination" whether a claimant is disabled. *Guiton v. Colvin*, 546 F. App'x 137, 139 & n.2 (4th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a)(4), 404.1594(f)). The ALJ asks, in sequence, whether the claimant (1) is currently working at "substantial gainful activity" levels; (2) has a severe medical impairment that satisfies the Act's duration requirement; (3) has a severe medical impairment that meets or medically equals any presumptively disabling impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity ("RFC"); and, if not (5) whether he or she can perform other work available in the economy. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

The fact that a claimant has been found "disabled" under the Act does entitle him or her to DIB payments indefinitely. *See* 42 U.S.C. § 423(f). The agency must periodically conduct a continuing disability review ("CDR") to determine if the claimant's disability continues—

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the Commissioner's final decision that is subject to judicial review under 42 U.S.C. § 405(g).

5

therefore entitling him or her to continued payments—or if the claimant's "disability ended" and he or she "is no longer disabled." 20 C.F.R. § 404.1594(a). Generally, the claimant's disability ends in the first month in which his or her severe medical impairment(s) no longer prevents him or her from doing SGA. *See id.* § 404.1594(g). This determination can be based on the claimant's "demonstrated" work activity alone, if the work he or she did in that month qualifies as SGA, *see, e.g.*, *id.* §§ 404.1575(e)(3), 404.1592a(a)(1), 404.1594(d)(5), or on a finding that the claimant's medical condition "improved" to the point that he or she can now do SGA, *see id.* § 404.1594(b)(3), (f)(3)–(8). The regulations establish distinct multi-step frameworks for making those determinations. *Compare id.* §§ 404.1574, 404.1575, *and* 404.1592a (work activity), *with id.* § 404.1594(f)(1)–(8) (medical improvement). The claimant's disability "benefits may be continued at any [step] if [the agency] determine[s] there is sufficient evidence to find that [he or she is] still unable to engage in substantial gainful activity." *Id.* § 404.1594(f) (emphasis omitted). Conversely, the agency in most cases "must show" that the claimant is currently able to engage in SGA "before [his or her] benefits are stopped." *Id.* § 404.1594(b)(5) (medical improvement); *accord id.* §§ 404.1574, 404.1575, 404.1592a (work activity).

### III. Procedural History

The ALJ's written decision dated July 28, 2022, is the centerpiece of this civil action. As this ALJ recognized, however, the road that got us to this point began more than a decade earlier. *See* R. 2155–56. A brief overview of Daniel's prior entitlement to disability benefits will help put this ALJ's findings and conclusions into context.

A.    *Initial SSI & DIB Claims*

Daniel was born in February 1985. R. 1241. In April 2003, shortly after his eighteenth birthday, he applied for supplemental security income ("SSI") benefits under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381–1383f. *See* R. 1022–25. The agency denied that claim on

initial review. *See* R. 1022, 1025. Upon reconsideration, it determined that Daniel "meets the

medical requirements" to receive SSI disability benefits. R. 1025. "On December 1, 2003, [he

was] found to be disabled with an onset date of April 1, 2003." R. 1022. Contemporaneous

administrative records explaining the medical basis for this favorable Title XVI determination

have been lost. *See* R. 640–41 (Apr. 2010); R. 891, 895–95 (Aug. 2008); R. 2303 (Sept. 2019).

Later administrative records indicate that Daniel was initially found eligible for SSI based on

severe mental impairments, namely major depressive disorder and borderline intellectual

functioning or leaning disorder.[4] *See* R. 638–41 (Apr. 2010); R. 139 (Aug. 2015). He received

SSI payments almost every month from April 2003 through February 2009, if not longer. *See* R.

891–92, 914, 1025–26, 1035–44, 1074–78, 1095–1102.

 Daniel also filed two DIB claims under Title II while receiving SSI benefits. *See* R.

1236–40 (Dec. 16, 2005); R. 1241–45, 1354 (Dec. 11, 2006). The agency denied the first DIB

claim, filed in December 2005, because Daniel was "currently working [and] making more than

[$]830.00 a month." R. 1073 (Dec. 20, 2005); *see* R. 1069–73. It "looked only at [his] work, not

[his] health problems" in making this determination. R. 1069. The agency also reduced Daniel's

monthly SSI payments to reflect his "estimated wages" earned between November 2004 and

January 2006. R. 1075 (Dec. 26, 2005); *see also* R. 914 (Feb. 18, 2009).

---

[4] In April 2004, the agency appointed Albemarle County Department of Social Services to be Daniel's representative payee for his SSI benefits. R. 1025–28. School records indicate that Daniel was in foster care at the time. *See* R. 1381–82 (Mar. 2004). In high school, Daniel had an Individualized Education Program for specific learning disability. R. 1381, 1397. He graduated with a "IEP diploma" in June 2003, and was allowed to remain enrolled in public school part-time to work on his reading and math skills. *See* R. 1382, 1390, 1397. Daniel also participated in an apprenticeship program through the school district the department of social services. R. 1377, 1380, 1390, 1395–98. He remained eligible for special-education services until his 22nd birthday. *See* R. 1379.

In the fall of 2006, Daniel filed a second DIB claim alleging he had been disabled since August 27, 2006. *See* R. 886, 1241–42, 1353–61. Daniel was working for Blue Ridge Lumber at the time. R. 1355. On August 27, he fell at work, "twisting and landing on the [right] knee at the same time. Since then, he . . . had a great amount of difficulty putting any weight on the knee and report[ed] feeling like the knee is going to give way on him." R. 1982 (Oct. 4, 2006). In October 2006, Ramon Esteban, M.D., noted that a recent MRI of the right knee showed a "strain of the posterior cruciate ligament," if not "a partial rupture." *Id.* (discussing right PCL injury sustained August 27, 2006). "In either case, [Daniel was] having instability of the knee when he walk[ed]." *Id.* The local DDS office denied this DIB claim initially, R. 886, and upon reconsideration, *see* R. 889, 891. The initial denial, dated March 19, 2007, indicates a "primary diagnosis" involving "disorders of muscle, ligament and fascia." R. 886. Medical records did not establish a "secondary diagnosis." R. 886. Contemporaneous agency records explaining the basis for DDS's unfavorable determinations on this DIB claim have been lost. *See* R. 431.

In February 2009, Daniel appeared with counsel at a hearing before ALJ Steve De Monbreum. Daniel did not testify at this hearing. Instead, ALJ De Monbreum sent Daniel's file back to the local DDS office to figure out why "they made a medical denial" on this DIB claim while still allowing him to receive SSI benefits based on a medically established disability.[5] R. 914; *see also* R. 891–94, 911–18. It appears that the SSI claim was undergoing a "medical CDR" around this same time. *See* R. 640–41 (Apr. 2010); R. 1371 (July 2009). In July 2009, regional

---

[5] Both Title II (DIB) and Title XVI (SSI) define "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Thus, someone who has shown that their medical impairment(s) rendered them "disabled" under one Title would likely also be considered "disabled" under the other Title. *See* R. 891–94, 911–18.

agency staff advised "that if the T16 [SSI] medical CDR is a continuance[,] then DDS should

reopen the T2 [DIB] disallowance and process as a collateral estoppel." R. 1371.

In April 2010, DDS psychologist Nicole Sampson, Ph.D., completed a Psychiatric

Review Technique ("PRT") assessing the nature, severity, and functionally limiting effects of

Daniel's then-existing medically determinable impairments ("MDIs"). *See* R. 612–35. Dr.

Sampson explained that she could not compare this "current information" to an earlier decision

finding that Daniel was disabled, or continued to be disabled, because the prior folder was lost.

R. 640 ("This is a lost folder. [Agency policies] state that when there is no CPD in file to

compare the current information with, we should always allow the claim even . . . if the claimant

does not have a significant problem."); *see also* R. 431. Dr. Sampson determined that Daniel had

two severe mental MDIs: borderline intellectual functioning and major depressive disorder. R.

614, 618–19. Those MDIs caused "moderate" problems in his social functioning and activities of

daily living; "marked" problems maintaining concentration, persistence, or pace; and no repeated

episodes of decompensation. R. 632. *See also* R. 431, 638–41. Accordingly, they did not meet or

medically equal the relevant Listings. *See* R. 612, 614, 618–19 (citing 20 C.F.R. pt. 404, subpt.

P, app. 1 §§ 12.02 (organic mental disorders), 12.04 (affective disorders) (2010)).

Dr. Sampson also completed a mental RFC assessment identifying Daniel's impairment-

related limitations doing specific mental work activities.[6] *See* R. 638–41. His abilities to do most

of those activities—such as following instructions, getting along with coworkers, and dealing

with ordinary work stress—ranged from "not significantly limited" to "moderately limited." *See*

---

[6] "This RFC assessment is a holistic and fact-specific evaluation," *Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017), of the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis" despite his or her MDIs, related symptoms, and medical treatment, SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). "A regular and continuing basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *2.

*id.* However, Daniel was "markedly limited" in his abilities to pay attention and concentrate for extended periods, to do activities within a schedule, and to work at a consistent pace without taking unreasonable breaks. R. 638–39. Ultimately, Dr. Sampson concluded that the "restrictions resulting from [Daniel's] impairments" rendered him "unable to meet the basic mental demands of competitive work on a sustained basis." R. 641 ("[He] would be unable to function in a competitive work environment."). She based her opinion on Daniel's "fully credible" statements describing his problems handling stress, paying attention, and staying on task at home, *id.*, as well as abnormal findings on a consultative psychological exam in March 2010, R. 662–64 (report from Jospeh Cianciolo, Ph.D., dated March 17, 2010). *See* R. 431, 641.

On November 8, 2010, DDS notified Daniel that it had granted (on "initial" review) the DIB claim he filed in the fall of 2006.[7] R. 117. His disability for DIB purposes began on August 26, 2007. *Id.* The Disability Determination & Transmission references a "primary" mental impairment involving "affective/mood disorders" and a "secondary" physical impairment involving "disorders of muscle, ligament and fascia."[8] *Id.* Remarks at the bottom read, "claimant incapable per Dr. Cianciolo report of 3/17/10" and "collateral estoppel." *Id.*; *see* R. 662–64, 1371. Later administrative materials indicate Daniel's "disability was continued [in November 2010] partially due to a lost folder" and partially based on Dr. Cianciolo's exam "where [Daniel] was presumed to be functioning in the borderline range of intelligence." R. 113 (Oct. 2014). Those materials do not note that Daniel injured his right knee on August 26, 2007. *See id.*

---

[7] It is not entirely clear whether this notice was an initial favorable determination, a CDR continuance on a prior claim, or some combination of the two. *See, e.g.*, R. 114, 117, 139, 431, 1371. Regardless, both parties agree that the November 8, 2010 determination is the comparison point decision ("CPD") in this case. R. 2162; Pl.'s Br. 51; Def.'s Br. 13.

[8] Later administrative materials show DDS had Daniel's treatment records related to both mental and physical impairments when it granted his DIB claim in November 2010. *See* R. 118–19 (Oct. 6, 2014).

B.    *DIB Cessation*

DDS opened a CDR on Daniel's DIB claim in 2014. *See* R. 114, 231–38. That July,

Daniel reported that his right knee, learning disability, and "bi-polar/psychotic episodes" still

limited his ability to work. R. 232. Howard Leizer, Ph.D., and Wyatt Beazley reviewed his

medical records for DDS in September 2014. *See* R. 119, 419–44. Dr. Leizer opined that

Daniel's severe learning disorder, bipolar disorder, and anxiety disorder, R. 420, 422, 424,

currently caused "mild" problems with his activities of daily living; "moderate" problems with

social functioning and maintaining concentration, persistence, or pace; and no repeated episodes

of decompensation, R. 429 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.02 (organic mental

disorders), 12.04 (affective disorders), 12.06 (anxiety disorders) (2014)). Daniel's abilities to do

most work-related mental activities on a regular and continuing basis "were not significantly

limited," but he did have "moderate" limitations staying on task for extended periods, working at

a consistent pace, and interacting with the public. *See* R. 433–34. Dr. Leizer opined that Daniel

currently "demonstrate[d] the ability to perform simple and routine work tasks requiring no more

than occasional interaction with the general public." R. 435. He based those limitations on

Daniel's history in special education, "average IQ range in 2007 testing," and "continued need

for psychiatric care showing . . . irritability and anxiety with regard to social functioning, though

no marked dysfunction[,] and stressors and symptoms [were] generally controlled." R. 434. Dr.

Leizer concluded that Daniel's "psychological conditions alone [were] not severe enough to

continue disability." R. 444 (noting that this 2014 CDR was Daniel's "second CDR" after being

"allowed [disability] for psychological conditions").

Dr. Beazley opined that Daniel could occasionally lift/carry up to 50 pounds, frequently

lift/carry objects weighing 25 pounds, sit and stand/walk for "about 6 hours" each during an

eight-hour workday, occasionally kneel, and frequently climb, balance, stoop, crouch, crawl. R.
438–39. He based those limitations on medical records showing "subjective" lower back pain,
"possible plica in the right knee," and a "successful" arthroscopic plica resection surgery in
January 2014. R. 444; *see* R. 438.

In October 2014, DDS notified Daniel that his disability previously found to have begun
on August 27, 2006, had "ceased" on October 6, 2014. R. 114. Like the CPD, this determination
indicates a primary MDI involving "affective/mood disorders" and a secondary MDI involving
disorders of the muscles, ligaments, and fascia. *Id.* The Notice of Disability Cessation explains
that Daniel's "health ha[d] improved" to the point that he was now able to work. *See* R. 118–19.
More specifically, while Daniel was "determined to be disabled [i]n 8/2006 due to major
depression," the "current evidence show[ed] that [he had] good ability to stand, walk and move
about, control [his] depressive symptoms, and understand and follow basic work instructions." R.
119; *see also* R. 113 (cessation rationale). DDS affirmed this cessation determination in March
2015, *see* R. 445–70, and again in August 2015, *see* R. 116, 138–45.

Over the next several years, Daniel testified at five hearings before two different ALJs.
*See generally* R. 72–112 (Apr. 2016); R. 778–821 (Sept. 2019); R. 751–77 (Jan. 2020); R. 714–
50 (July 2020); R. 2204–39 (July 2022). ALJ Thomas Erwin issued unfavorable decisions in
June 2016 and again in August 2020, but this Court reversed and remanded both final decisions
under 42 U.S.C. § 405(g). *See generally* R. 20–35 (Aug. 2016); R. 854–84 (Jan. 2019); R. 2243–
75 (Aug. 2020); R. 2291–97 (Oct. 2021). The matter is now back before this Court on ALJ
Jeffrey Schueler's unfavorable decision issued July 28, 2022. *See* R. 2156–90. This written
decision is Commissioner's final decision that Daniel's prior disability ended and that he has not
become disabled again. *See* R. 2146.

## IV. Discussion

As noted, a claimant's disability typically "ends" in the first month in which his or her severe medical impairment(s) no longer prevents him or her from doing SGA. *See* 20 C.F.R. 404 § 404.1594(g). This determination can be based on the claimant's "demonstrated" work activity alone, if that month's work activity qualifies as SGA, *e.g.*, *id.* §§ 404.1575(e)(3), 404.1594(f)(1), or on a finding that the claimant's preexisting impairment(s) "improved" to the point that he or she can now do SGA notwithstanding his or her current medical impairment(s), *see id.* § 404.1594(f)(3)–(8). ALJ Schueler's July 2022 decision contains determinations that Daniel's "disability ended" for both reasons, albeit in different months. R. 2190. One, Daniel's "disability ended in January 2015, the first month in which [he] engaged in SGA after the completion of his TWP." R. 2190 (citing 20 C.F.R. §§ 404.1592a(1), 404.1594(f)(1)). Two, Daniel's "disability ended on October 6, 2014, based on medical improvement and the ability to perform [SGA] work in the national economy," R. 2162; *see also* R. 2190.

The Commissioner may rely on either ground to terminate Daniel's DIB payments—but only if ALJ Schueler applied the correct legal standard and substantial evidence supports his factual findings. *See Duvall*, 569 F.2d at 821. To affirm on the first ground, this Court must be able to determine that ALJ Schueler correctly applied the "countable income test" in concluding that Daniel "performed [SGA] *in* January 2015," R. 2159 (emphasis added); *see* 20 C.F.R. § 404.1575(e), and that substantial evidence supports his underlying factual findings. *See generally Fox*, 632 F. App'x at 754–55. To affirm on the second ground, this Court must be able to determine that ALJ Schueler correctly applied *both* the medical-improvement standard when evaluating Daniel's preexisting medical impairment(s), 20 C.F.R. § 404.1594(f)(3)–(4), *and* the legal standards for evaluating his ability to do SGA based on his current medical impairment(s),

*id.* § 404.1594(f)(6)–(8). *See generally Dowling*, 986 F.3d at 384–88; *Knight v. Comm'r of Soc. Sec. Admin.*, No. 22-1585, 2013 WL 3018428, at *1–2 (4th Cir. Apr. 20, 2023); *Bautista v. Astrue*, Civ. No. TJS-11-1651, 2013 WL 664999, at *3–7 (D. Md. Feb. 22, 2013). Substantial evidence must support the ALJ's underlying factual findings on both points. *See Dowling*, 986 F.3d at 383.

A.    *SGA in January 2015*

The term "substantial gainful activity" goes to the heart of what it means to be "disabled" under the Social Security Act. *See* 42 U.S.C. § 423(d)(1)(A). If a claimant "is working and the work [he or she] is doing is substantial gainful activity, [the ALJ will find [the claimant is] not disabled," regardless of his or her medical condition and functional limitations. 20 C.F.R. § 404.1520(b) (initial determinations); *see Payne v. Sullivan*, 946 F.2d 1081, 1082–84 (4th Cir. 1991) (initial determinations); *accord* 20 C.F.R. § 404.1594(d)(5), (f)(1) (CDR determinations); *Katz v. Sec'y of Health & Human Servs.*, 972 F.2d 290, 293 (9th Cir. 1992) ("[I]t is not necessary to show medical improvement where SGA is the [dispositive] issue."). Even if the claimant is not working when the ALJ issues an unfavorable decision, evidence that he or she used to do SGA-level work is relevant to the disability determination. 20 C.F.R. §§ 404.1571, 404.1592, 404.1592a(a)(1), 404.1594(f)(6)–(7). "Substantial gainful activity is work activity that is both substantial and gainful: Substantial work activity is work activity that involves doing significant physical or mental activities," even if those activities were "done on a part-time basis." *Id.* § 404.1572(a) "Gainful work activity is work activity that [the claimant did] for pay or profit whether or not a profit [was] realized." *Id.* § 404.1572(b). In short, SGA means the claimant's past or current "work activity" that "involves doing significant physical or mental activities . . . for pay or profit." *Id.* § 404.1572(a)–(b).

The amount of income that the claimant earns from working is the primary factor used to determine if such work qualifies as SGA. *Id.* §§ 404.1574, 404.1575. The other factors relevant to this determination will depend on the claimant's employee/self-employer status when he or she did the work, *id.* §§ 404.1574(a), 404.1575(a), whether the claimant was entitled to DIB at the time, *id.* §§ 404.1574(b), 404.1575(a)(1), and, if so, whether the claimant had "received such benefits for at least 24 months" before working, *id.* §§ 404.1574(b)(3)(iii)(A), 404.1575(e)(1). Section 404.1574 applies when the claimant was an employee. If the claimant was self-employed, then § 404.1575 applies. *See Connie S. v. Kijakazi*, No. 5:20cv64, 2022 WL 729435, at *4–5 (W.D. Va. Mar. 9, 2022), *adopted*, 2022 WL 891978 (W.D. Va. Mar. 25, 2022).

    *1.   Relevant Evidence*

Daniel started receiving DIB payments in or around November 2010. *See* R. 117; 20 C.F.R. §§ 404.1575(e)(2), 404.1800, 404.1805. From 2014 through 2018, he worked "a little bit here and there" doing small-engine repair and brake work out of his home garage. R. 799; *see also* R. 85, 95–97 (Apr. 2016 testimony); R. 797–99, 808 (Sept. 2019 testimony). He "tr[ied] to get as much work as [he] could," but his house was several miles off the main road, and he did not advertise the repair shop. R. 808–10 (Sept. 2019). In 2014 and 2015, Daniel and his father-in-law managed the business as equal partners. R. 809–10; *see also* R. 85, 95–97 (Apr. 2016). Sometimes they worked on repair jobs together, but other times each man worked by himself. R. 808 (Sept. 2019); R. 95–97 (Apr. 2016). They did not have a set work schedule; they just did what needed to be done when customers showed up at their shop. *See id.* They charged between $20 and $35 per hour, "[b]ut most jobs didn't take maybe an hour, hour-and-a-half" to finish, and "some . . . didn't even take half an hour." R. 811. Daniel and his father-in-law split their earnings "50/50" no matter who did the work. R. 85, 95–97, 808.

In April 2016, Daniel testified he "did a little bit of work" on other people's cars to help cover his family's bills in 2014, but "it wasn't much of anything." R. 84. He worked "maybe a couple days a week" on a schedule that he described as "ten minutes on, ten minutes off." R. 98. He "more or less quit doing anything [in 2015] because" the ruptured PCL in his right knee hurt so badly. R. 86; *see also* R. 85–86, 88–89, 96–98. *But see* R. 1292–93, 1295–98. In September 2019, Daniel testified that he worked "no more than two weeks" a month. R. 809. His attorney asked if he worked "about 14 days a month," and he said he did. R. 810. The work "wasn't continuous," however. R. 96 (Apr. 2016); *see also* R. 811 (Sept. 2019). Some months saw no customers at all. R. 811. "[T]he most work [he] really got was something like April to September [or] October. That's usually the busiest time of year," but it all depended "on how much rain and how much warmth [the area] had left in the year." *Id.* After 2015, Daniel operated the repair business entirely by himself. *See* R. 807 (Sept. 2019). He stopped doing small-engine repair after 2018 because carpal tunnel made his hands hurt. *See* R. 797, 799, 811–12, 1292–98.

In April 2019, Daniel told the agency that he started doing small-engine repair on January 1, 2014, and that he was "[s]till working" at that time. R. 1295; *see* R. 1292–1300 (Ex. 17E). On average, he worked "about 20" hours a week during this time. R. 1295. Daniel earned "about $14,000 per year" in self-employment income in 2014, 2016, 2017, and 2018. *Id.*; *see also* R. 1292 (actual reported earnings); R. 227, 1314, 1317, 1320, 1334, 1336, 1339 (tax returns for 2014 and 2016–2018). In 2015, his income dropped slightly to "about $1,000/month." R. 1295. Daniel reported earning $13,966 in self-employment income for 2015. *See* R. 1292.

2.    *The ALJ's Decision*

ALJ Schuler applied § 404.1575 based on his factual findings that Daniel earned self-employment income from work activity performed in January 2015, while he was entitled to

16

DIB. *See* R. 2158, 2160–62. The record supports both findings, R. 1292, 1295, and Daniel does

not challenge them. Pl.'s Br. 43–49. Next, ALJ Schueler needed to determine if Daniel worked

"before or after [he] received such benefits for at least 24 months." 20 C.F.R. § 404.1575(a)(1).

If *before*, the ALJ would use one of three multi-factor tests in paragraph (a)(2) to determine if

Daniel did SGA in January 2015. *Id.* § 404.1575(a)(2)(i)–(iii); *see, e.g.*, *Dunaway v. Comm'r of

Soc. Sec.*, No. 2:17cv409, 2018 WL 4140915, at *3–6 (M.D. Fla. Aug. 30, 2018). He could "not

consider [Daniel's] income alone" under any of those three tests. 20 C.F.R. § 404.1575(a)(2); *cf.*

*Payne*, 946 F.2d at 1083–84 (explaining that the ALJ cannot rely on a claimant's income alone to

deny initial disability claim based on a finding that the claimant is currently engaged in SGA as

an employee, 20 C.F.R. §§ 404.1573, 404.1574). If *after*, the ALJ would use the "special rules"

in paragraph (e), including the "countable income test," to make that determination. 20 C.F.R. §

404.1575(e)(3). This test allowed the ALJ to find that Daniel did SGA in January 2015 based

entirely on the fact that his "monthly countable income average[d] more than a certain dollar

amount,"[9] *Smith v. Soc. Sec. Admin.*, 538 F. App'x 484, 487 (5th Cir. 2013), "*unless* the

evidence shows that [he] *did not* render significant services in the month(s)," 20 C.F.R. §

404.1575(e)(3) (emphasis added). *See, e.g.*, *Aponte v. Astrue*, No. 6:11cv700, 2012 WL

2321007, at *3, *5–7 (M.D. Fla. July 12, 2012).

The definition of "significant services" depends on whether the claimant "operate[d] a

business entirely by" himself or herself, or whether the "business involve[d] the services of more

than one person." 20 C.F.R. § 404.1575(b)(1). If the former, then "*any* services that [the

claimant] render[ed] are significant to the business." *Id.* (emphasis added). If the latter, then the

ALJ will find that the claimant "render[ed] significant services if [he or she] contribute[d] more

---

[9] For 2015, this dollar amount was set at $1,090 per month. *See* R. 2158; Pl.'s Br. 44.

than half the total time required for the management of the business, *or* [he or she] render[ed] management services for more than 45 hours a month regardless of the total management time required by the business." *Id.* (emphasis added). Both prongs focus on the amount of time that the claimant contributed to "managing" his or her business in the month(s) at issue. *See id.* §§ 404.1575(b)(1), (e)(3); *Aponte*, 2012 WL 2321007, at *7 (reversing and remanding where ALJ relied on facts having "no relevance on the issue of the amount of time Plaintiff worked" at his and his wife's business).

ALJ Schueler applied § 404.1575(e) based on his finding that Daniel received DIB "for over 8 years by January 2015." R. 2160. *But see* 20 C.F.R. § 404.1575(e)(2) (explaining that the 24-month period runs from the "first day of the first month . . . for which you actually received social security disability benefits that you were due [under Title II] or constructively received such benefits," and that "months for which you received only supplemental security income payments [under Title XVI] . . . will not be counted for the 24-month requirement"). He found that Daniel's countable income averaged $1,166.33 per month in 2015, which exceeded that year's minimum "monthly SGA amount" of $1,090. *See* R. 2158 (citing Ex. 17E). Daniel's average monthly countable income also exceeded the applicable minimums in 2016, 2017, and 2018. *See id.* (citing Ex. 17E). The ALJ correctly noted that those findings allowed him to "presume" that Daniel did SGA in any month(s) from 2015–2018, *see* R. 2161–62, "'unless the evidence shows that [Daniel] did not render significant services in the month(s),'" R. 2161 (quoting 20 C.F.R. § 404.1575(e)(3)). He put the burden on Daniel to "prov[e] that he did not render significant services." R. 2161.

To ALJ Schueler, "[t]he evidence show[ed]" that Daniel "performed significant services from 2015 through 2018." *Id.* He credited Daniel's testimony that "he work[ed] 'a little bit here

and there' doing small engine repair from 2014 to 2018." R. 2159 (quoting R. 799). Daniel

"not know how much he worked each month," but he "said he worked approximately two weeks

per month on average." *Id. But see* R. 1295 (reporting "about 20 hours" of work per week in

2014–2018). Daniel "worked with his father-in-law . . . in 2014 and 2015. They had no formal

agreement but simply split the money 50-50 for each small engine job they did together. After

2015, [Daniel] worked on his own without anyone else." R. 2161. ALJ Schueler recognized that

§ 404.1575(b) contained a two-part standard for determining if Daniel "rendered significant

services" in 2014–2015 while working with his father-in-law and a different, single-factor test

for deciding if he rendered such services in 2016–2018 when he ran the repair shop by himself.

*See* R. 2161–62. He concluded that Daniel rendered significant services "[f]rom 2016 to 2018 . .

. because he operated the business himself." R. 2161.

Next, ALJ Schueler explained that "[f]rom 2014 to 2015, when [Daniel] worked together

with his father-in-law, he performed significant services if he performed services over 45 hours

per month or contributed more than half the total time required for the management of the

business." R. 2162 (citing 20 C.F.R. § 404.1575(b)(1)). He found that Daniel "generally worked

about 2 weeks per month on average, which would be approximately 80 hours per month. While

this [figure] is an estimate, it is far above the 45 hours per month requirement." *Id.* (citing §

404.1575(b)(1)). "This factor alone show[ed]" that Daniel "perform[ed] significant services in

2014 and 2015." *Id.*

ALJ Schueler did not discuss Daniel's work hours on a month-by-month basis, as §

404.1575(b) and (e) likely require. *See* 20 C.F.R. § 404.1575(b)(1), (e)(3). Nonetheless, his

conclusion that Daniel's "disability ended in January 2015" because that was the "first month in

which [he] engaged in SGA" after his TWP ended, R. 2190, contains an implied finding that

19

Daniel in fact worked (i.e., rendered management services) for more than 45 hours "in January 2015," R. 2159. *See also* R. 2162 ("He performed [SGA] for 48 months from 2015 to 2018."). Alternatively, ALJ Schueler concluded that Daniel had "not overcome his burden of proof by providing evidence that he did not perform more than half the services at the business." *Id.*; *see* R. 2161 (citing § 404.1575(e)(3)). He based that conclusion on Daniel's "report[] that he worked together with his father-in-law and [that] they split the money," as well as Daniel's purported failure to "offer[] any evidence as how much he or his father-in-law worked." R. 2162.

### 3. *Analysis*

On appeal, Daniel agrees that his earned income was "a little over" the SGA limit for 2015.[10] Pl.'s Br. 44; *see* R. 1292–93, 1295. He primarily objects to the ALJ's reliance on § 404.1575(e)'s countable income test, which applies to a self-employed claimant's work activity performed after he or she has received DIB for at least 24 months. Pl.'s Br. 43–49 (discussing *Payne v. Sullivan*, 946 F.2d 1081 (4th Cir. 1991) (current work activity related to initial determinations); 20 C.F.R. § 404.1575(a)(2)(i)–(iii) (past work activity in pre-24 month CDR determinations)). He argues the ALJ should have used the three multi-factor tests "under paragraph (a)(2) since [he was] evaluat[ing] work activity *prior to* receiving social security disability benefits for at least 24 months." *Id.* at 46 (emphasis added). Under those tests, ALJ Schueler could not have relied on Daniel's self-employment "income alone" to support a conclusion that he did SGA-level work in January 2015. 20 C.F.R § 404.1575(a)(2). He would have been required to more fully evaluate the nature and quality of Daniel's "work activity based

---

[10] Daniel estimated that he earned "about $1,000/month" in 2015. R. 1295. He reported earning $13,966 for the year, R. 1292, which is an average of $1,163.83 per month over twelve months.

on the value of [his] services to the business" considering the relevant factors in Test One, Test Two, and/or Test Three. *Id.* § 404.1575(a)(2)(i)–(iii); *see Dunaway*, 2018 WL 4140915, at *3.

Test One incorporates the "significant services" standard from paragraph (b)(1). *See* Pl.'s Br. 46–47; 20 C.F.R. § 404.1575(a)(2)(i). On that point, Daniel asserts that he "did not contribute more than half the total time required for the management of the business and in the alternative did not render management services for more than 45 hours per month" in 2015. Pl.'s Br. 46 (citing § 404.1575(a)(2)(i), (b)(1)); *see id.* at 46–47 (citing R. 84–86, 95–98, 797–99, 807–09, 811, 2162). ALJ Schueler assumed Daniel rendered management services for "approximately 80 hours per month" based solely on Daniel's testimony that he "generally worked about 2 weeks per month on average." R. 2162; *see* Pl.'s Br. 47. But, Daniel "never testified that he worked 8 hours per day [for] 14 days per month" in 2015. Pl.'s Br. 47. Instead, he testified that he worked only on the days he was able, usually about 14 days a month, and that most repair jobs took 30 to 90 minutes to complete. *Id.* Thus, Daniel argues that substantial evidence does not support the ALJ's finding that he rendered management services for more than 45 hours per month. *Id.*

Daniel's first argument misses the mark. *See* Def.'s Br. 6 ("Plaintiff applies the incorrect subsection of the regulations to argue that the ALJ should have done a further analysis regarding the nature and quality of the work he performed [in January 2015] rather than focusing on the amount he earned and whether he performed 'significant services.'"). Daniel started receiving DIB in or around November 2010. *See* R. 117. ALJ Schueler was evaluating Daniel's work activity in January 2015, *see* R. 2150–62, which is well beyond the regulation's 24-month requirement. 20 C.F.R. § 404.1574(e)(2). Thus, he correctly chose to apply the countable income test in subsection (e)(3) rather than any of the multi-factor tests in subsection (a)(2). *See Aponte*, 2012 WL 2321007, at *3. ALJ Schueler also reasonably found that Daniel's monthly countable

21

income in January 2015 averaged more than the presumptive SGA amount for that year. *See* R.

2158, 2161–62 (citing Ex. 17E).

But this does not end the inquiry. 20 C.F.R. § 404.1575(e)(3); *see, e.g.*, *Aponte*, 2012 WL

2321007, at *6–7. ALJ Schueler's conclusion that Daniel's "disability ended in January 2015,"

R. 2190, relied entirely on his earlier conclusion that Daniel "first performed substantial gainful

activity in January 2015," R. 2159. *See* 20 C.F.R. § 404.1575(e)(1). That conclusion in turn

relied on the ALJ's finding that Daniel's monthly countable income averaged more than the

presumptive SGA amount, *see* R. 2158–59, *and* on his implied finding that Daniel rendered

significant services "in January 2015," *see* R. 2161–62. Substantial evidence supports the first

finding. For the Court to affirm the termination of Daniel's disability benefits based on his work

activity "in January 2015," R. 2159, 2190, however, the ALJ's decision must build an accurate

and logical bridge from the evidence he cited to his conclusion that Daniel rendered significant

services in that month, *Aponte*, 2012 WL 2321007, at *6–7. *See generally Arakas*, 983 F.3d at

95; *Fox*, 632 F. App'x at 754–55; *Patterson*, 839 F.2d at 225. It does not.

The ALJ's finding that Daniel "generally worked about 2 weeks per month on average,

which would be approximately 80 hours per month," R. 2162 (citing R. 809), appears to assume

that Daniel worked approximately 40 hours a week for two weeks each month. *See* Pl.'s Br. 47.

The ALJ did not explain why he assumed a 40-hour workweek, R. 2162, and nothing in Daniel's

testimony supports that assumption. *Cf. Hayes v. Saul*, No. 7:18cv145, 2019 WL 3891345, at *5

(E.D.N.C. July 22, 2019) (ALJ erroneously "assumed without explanation" that normal findings

on claimant's brain MRI rendered her IQ scores "invalid"). In April 2016, for example, Daniel

testified that he worked "maybe a couple days a week" on a schedule that he described as "ten

minutes on, ten minutes off." R. 98. In September 2019, he testified that "most" of the repair jobs

he and his father-in-law did in 2014–2015 "didn't take maybe an hour, hour-and-a-half" to finish, and "some . . . didn't even take half an hour." R. 811. "Most" of that work also happened from April through September or October, not in the winter months. R. 811. None of this evidence supports the ALJ's implied finding that Daniel's actual work hours in January 2015 were "far above the 45-hour per month requirement," let alone that he worked "approximately 80 hours" that month, R. 2161. *See* 20 C.F.R. § 404.1575(b)(1), (e)(3).

Moreover, ALJ Schueler overlooked Daniel's sworn statement that he worked "about 20" hours per week (on average) from January 2014 through at least April 2019. R. 1295; *see* R. 1300. The ALJ found that Daniel "worked about 2 weeks per month" in 2014–2015, R. 2162, meaning that a 20-hour workweek would be only 40 hours per month, R. 1295. This is below the regulation's "45 hour per month requirement" that ALJ Schueler relied upon to conclude Daniel actually rendered "significant services in 2014 and 2015." R. 2161. *Cf. Hines*, 453 F.3d at 566 ("The deference accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence.").

The ALJ also concluded that Daniel failed to show "he did not perform more than *half of the services* at the business" in 2014–2015 because Daniel testified that "he worked with this father-in-law and [that] they split the money" and Daniel did not "offer[] any evidence as to how much he or his father-in-law worked." R. 2161 (emphasis added). This prong of the "significant services" standard looks at whether Daniel "contribute[d] more than half the total *time required for the management of* the business," 20 C.F.R. § 404.1575(b)(1) (emphasis added), not at how Daniel and his father-in-law split "the services at" the repair shop or their earnings therefrom, R. 2162. *Cf. Aponte*, 2012 WL 2321007, at *7 (reversing and remanding where ALJ relied on facts having "no relevance on the issue of the amount of time Plaintiff worked" at his and his wife's

23

business). The ALJ's finding that Daniel did not offer "any evidence as to how much he . . .

worked" also contradicts both Daniel's work report, R. 1295, and the ALJ's earlier finding that

Daniel worked roughly "80 hours per month" in 2014–2015, *see* R. 2162. The ALJ indicated that

he based this finding on Daniel's testimony. *Cf. Warren v. Astrue*, No. 2:08cv3, 2008 WL

2385756, at *11 (W.D. Va. Aug. 8, 2008) ("The ALJ's decision cannot be supported by

substantial evidence when he fails to adequately explain his rationale for rejecting the opinions

of those whom he otherwise gave great weight to in arriving at this decision.").

ALJ Schueler's deficient "significant services" analysis upends his conclusion that

Daniel's disability ended in January 2015 solely because he did SGA-level work in January

2015. *See* R. 2159, 2161–62, 2190. If the Commissioner intends to terminate Daniel's DIB based

on his SGA-level work activity for any month before 2016, then the ALJ must explain how he

considered Daniel's statement indicating he worked a 20-hour workweek, R. 1295, in concluding

that Daniel performed significant services in the month(s). *See* 20 C.F.R. § 404.1575(b)(1),

(e)(3).

B.      *Medical Improvement & Current Ability to do SGA*

ALJ Schueler also determined that Daniel's "disability ended on October 6, 2014,"

because his prior impairments medically improved by that date, and he "has not become disabled

again since that date." R. 2190; *see generally* R. 2168–75 (medical improvement), 2175–88

(current impairments). Daniel's brief challenges both aspects of that determination. *See* Pl.'s Br.

49–58 (medical improvement), 58–69 (current mental RFC), R. 69–77 (current physical RFC),

78–84 (current symptoms).

The regulations establish an eight-step framework for determining whether a DIB

recipient continues to be disabled. *See* 20 C.F.R. § 404.1594(f)(1)–(8). Those steps are:

(1) Is the claimant engaging in substantial gainful activity? If yes, the disability has ended. If no, proceed to step two. (2) Does the claimant have an impairment or combination of impairments [that] meets or equals an impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1? If yes, the disability continues. If no, proceed to step three. (3) Has there been medical improvement as shown by a decrease in the medical severity of the impairment(s) that existed at the time of the most recent favorable disability decision? If yes, proceed to step four. If no, proceed to step five. (4) Is the medical improvement related to the ability to work, i.e., has there been an increase in the claimant's RFC? If yes, proceed to step six. If no, proceed to step five. (5) Do any of the exceptions set out in 20 C.F.R. § 404.1594(d) or (e) apply? If none of them apply, the claimant's disability continues. If one of the first group of exceptions to medical improvement applies, proceed to step six. If one of the second group of exceptions . . . applies, the claimant's disability has ended. (6) Is the claimant's current impairment or combination of impairments severe? If yes, proceed to step seven. If no, the disability has ended. (7) Does the claimant possess the RFC to perform [his or] her past relevant work? If yes, the disability has ended. If no, proceed to step eight. (8) Does the claimant's RFC, when considered with the claimant's age, education, and work experience, allow [him or her] to do other work? If yes, the disability has ended. If no, the disability continues.

*Dowling*, 986 F.3d at 383 (citing 20 C.F.R. § 404.1594(f)(1)–(8)). "[T]he burden is on the Commissioner to show that a medical improvement has occurred and that the improvement relates to the claimant's ability to work." *Edwards v. Astrue*, No. 4:12cv5, 2012 WL 6082898, at *3 (W.D. Va. Dec. 2, 2012) (citing *Lively v. Bowen*, 858 F.2d 181, n.2 (4th Cir. 1988)); *see* 20 C.F.R. § 404.1594(a), (f)(3)–(4). "Even where medical improvement related to [the claimant's] ability to work has occurred," however, the Commissioner "must also show" that the claimant is "currently able to engage in substantial gainful activity before [the agency] can find" that the claimant is "no longer disabled." 20 C.F.R. § 404.1594(a); *see id.* § 404.1594(f)(7)–(8).

Daniel challenges the ALJ's analysis at step three, which focuses on the nature, severity, and functionally limiting effects of "impairment(s) present at the time of the most recent favorable medical decision that [Daniel] disabled or continued to be disabled,"[11] 20 C.F.R. §

---

[11] The most recent favorable decision is called the comparison point decision ("CPD"). *See* 20 C.F.R. § 404.1594(b)(7).

404.1594(c)(1)–(2). *See* Pl.'s Br. 49–58 (medical improvement). He also challenges the ALJ's

subsequent analysis focusing on the nature, severity, and functionally limiting effects of his

*current* medical impairment(s), which may or may not include impairments that were present at

the CPD, 20 C.F.R. § 404.1594(f)(6)–(8). *See* Pl.'s Br. 58–84.

      *1.    Medical Improvement*

      "Medical improvement is any decrease in the medical severity of [the claimant's]

impairment(s) which was present at the time of the most recent favorable medical determination

that [he or she was] disabled or continued to be disabled." 20 C.F.R. § 404.1594(b)(1). Such

decrease "must be based on improvement in the symptoms, signs, and/or laboratory findings

associated with [the] impairment(s)," *id.*, as documented "by a comparison of prior and current

medical evidence," *id.* § 404.1594(c)(1). "Symptoms" are the claimant's own description of his

or her medical impairment(s). *Id.* § 404.1502(g). Signs and findings are any "anatomical,

physiological, or psychological abnormalities that can be observed," measured, or described

through acceptable clinical diagnostic techniques. *See id.*

      Thus, a proper medical improvement ("MI") analysis has three parts: (1) identification of

the claimant's CPD impairment(s) and its associated signs, symptoms, or findings at the time of

the CPD; (2) comparison of relevant medical evidence showing the severity of the claimant's

impairment(s) at the CPD to relevant medical evidence showing the current severity of the same

impairment(s); and (3) a determination that such comparison shows "changes (improvement) in

the symptoms, signs, or laboratory findings associated with that impairment(s)," 20 C.F.R. §

404.1594(c)(1). *See, e.g.*, *Knight*, 2013 WL 3018428, at *1–2; *Smiley v. Saul*, No. 1:19cv163,

2020 WL 3259541, at *2 (W.D.N.C. June 16, 2020); *Latchum v. Astrue*, No. 4:07cv42, 2008 WL

3978081, at *2–3 (W.D. Va. Aug. 26, 2008). The ALJ's decision also must build an accurate and

logical bridge from the evidence to his or her conclusion that medical improvement occurred by a certain date. *See Knight*, 2013 WL 3018428, at *1–2; *Lisa D. v. Berryhill*, Civ. No. TMD 17-2488, 2018 WL 6699795, at *5 (D. Md. Dec. 20, 2018) (citing *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)).

Daniel argues substantial evidence does not support "the ALJ's determination that medical improvement occurred as of October 6, 2014," Pl.'s Br. 49, because he made "a multitude of errors," *id.*, at 58, when evaluating Daniel's preexisting "bipolar disorder with psychotic symptoms, borderline intellectual functioning[,] learning disorder, [and] anxiety disorder," R. 2162. *See generally* Pl.'s Br. at 52–58. Those alleged errors fall into three categories. First, the ALJ's discussion "consolidates all of [Daniel's] mental impairments" into one analysis rather than determining medical improvement on an impairment-by-impairment basis. *Id.* at 53. Second, the ALJ's analysis focuses on Daniel's improving mental health during "a finite period of time in 2014[,] and ignores" medical evidence showing that he experienced significant anxiety, depressive, and psychotic symptoms in 2016 and 2018–2021. *See id.* at 53–57. Third, substantial evidence does not support some of the ALJ's reasons for finding improvement in the signs and symptoms associated with Daniel's preexisting anxiety disorder and mood disorder with psychotic symptoms. *See id.* at 52–53. Daniel's arguments are not persuasive.

ALJ Schueler's medical improvement analysis, R. 2162, 2168–75, satisfies "the deferential standard of review provided under 42 U.S.C. § 405(g)." *Linebarry v. Barnhart*, No. 7:04cv601, 2005 WL 2304744, at *5 (W.D. Va. Sept. 15, 2005). First, he found that Daniel had the following severe mental and physical MDIs at the CPD in November 2010: "bipolar disorder with psychotic symptoms[;] borderline intellectual functioning; learning disorder[;] anxiety

disorder with myoclonic jerks; lumbago with lumbar disc bulge; cervicalgia; degenerative disc disease of the knees; obesity; and carpal tunnel syndrome."[12] R. 2162. He also discussed the nature and severity of specific symptoms and objective findings associated with those (or similar) MDIs as they existed before the CPD. *See* R. 2168–71 (citing R. 117, 612–41, 1424, 1431–33, 1770–73, 1799, 1809–13, 1975–78, 1981, 1999, 2015–16). In September 2006, for example, an MRI of Daniel's injured right knee showed a PCL strain and joint effusion. R. 2171 (citing R. 1976–80, 2015). That November, Dr. Esteban referred him to UVA to be evaluated for possible PCL reconstructive surgery. *Id.* (citing R. 1981). Daniel complained of right knee pain through at least December 2008. *Id.* (citing R. 1814); *see also* R. 642–43, 662–63, 1777–80, 1976–80, 1806. Healthcare providers routinely noted an antalgic gait, limited range of motion, and tenderness. *Id.* (citing R. 1814, 1981, 1999); *see also* R. 642–43, 663, 1981–82.

The ALJ focused on the abnormal signs and symptoms associated with Daniel's severe "bipolar disorder with psychotic symptoms, borderline intellectual functioning[,] learning disorder, [and] anxiety disorder," R. 2162, because that was "the main reason [Daniel] was found disabled . . . at the CPD," R. 2169. *See* R. 2168–70 (citing R. 117, 612–41, 1421–24, 1431–33, 1799, 1809–13). From 2007–2010, for example, Daniel told healthcare providers that he had "significant mood disturbance" and mood instability, R. 1770; persistent depression and lack of motivation, R. 1809, 1811–12; some anxiety, R. 1770; and occasional visual hallucinations, R. 1771. He often reported severe anger-management problems, R. 1424, 1799, 1809, 1811–12, including feeling like he "could 'explode' at any point," R. 1811. Some providers observed that

---

[12] Some of these MDIs either are not apparent from Daniel's medical records at all, *see, e.g.*, R. 578 (major depressive disorder without psychotic symptoms, Apr. 2016); R. 552 (normal knee x-rays, Jan. 2015), or were not diagnosed until a few years after the CPD, *see, e.g.*, R. 324 (bipolar disorder, Jan. 2014); R. 2091 (carpal tunnel, July 2019). Nonetheless, this Court must review the ALJ's decision based on the findings he actually made. *See Patterson*, 839 F.2d at 225.

Daniel spoke in a low volume, R. 1421, 1432, appeared anxious, R. 1432, and had a constricted

affect, R. 1431. In 2008, Daniel's counselor twice noted that he appeared "child-like" and

"cognitively impaired." R. 1799, 1811. The ALJ's discussion of this evidence demonstrates that

he actually examined relevant medical "records generated before the CPD." *Huerta v. Colvin*,

No. CV-16-4206, 2017 U.S. Dist. LEXIS 203398, at *9 (C.D. Cal. Dec. 11, 2017) ("A proper

finding of medical improvement requires examination of reports and records generated before

the CPD.").

ALJ Schueler also recognized that Daniel's severe mental MDIs "markedly" limited his

ability to maintain the concentration, persistence, and pace needed to do even simple, unskilled

work tasks in 2007–2010. R. 2169–70 (citing R. 638–41, 1422–24); *see also* R. 2162 (CPD-era

mental RFC). In August 2007, James Worth, Ed.D., opined that Daniel's performance on the

Wechsler Adult Intelligence Scale-III indicated that, although Daniel had an average IQ, his

"concentration and attention problems markedly reduced [his] intellectual efficiency." R. 1422.

Dr. Worth also opined that Daniel was "somewhat more vulnerable than the average worker to

the ordinary stressors of a competitive work environment." R. 1424. In April 2010, Daniel told

Dr. Sampson, "he has to be constantly reminded to take care of his personal hygiene," "cannot

complete a task without being distracted," "can't handle any pressure at all," and "does not have

any motivation to do anything." R. 641. Dr. Sampson found Daniel's statements "fully credible"

in light of the very limited medical evidence available to her at the time. *See* R. 640–41 (citing R.

1432–33). She opined that the restrictions resulting from Daniel's severe borderline intellectual

functioning and major depressive disorder, R. 614, 619, rendered him "unable to meet the basic

mental demands of competitive [unskilled] work on a sustained basis," R. 641. Dr. Sampson's

medical opinion provided the basis for the CPD that Daniel was disabled by major depressive

disorder and borderline intellectual functioning. *See* R. 113, 117. ALJ Schueler discussed this evidence in his MI analysis. *Compare* R. 2169–70, *with Lakesha B. on behalf of N.A.R. v. Saul*, No. 4:19cv35, 2021 WL 372798, at *5 (W.D. Va. Feb. 3, 2021) (noting that the ALJ "did not even mention any evidence upon which [child's] disability was premised before concluding" that medical improvement occurred).

Second, ALJ Schueler "actually compared" the CPD-era (2007–2010) medical evidence to relevant medical evidence showing the severity of the same (or similar) signs and symptoms associated with Daniel's preexisting physical and mental MDIs beginning in 2014. *Compare* R. 2171–74, *with* R. 874 (concluding that ALJ Erwin's MI analysis did "not actually compare the medical evidence of Daniel['s] condition at the time of the CPD to the current severity of his condition."); *see also Knight*, 2013 WL 3018428, at *1 (remanding where "the ALJ did not compare [new] findings to evidence of Knight's condition during the time the ALJ found him to be disabled"). He found "no medical improvement in [Daniel's] knee impairments, which [were] diagnosed as a knee strain in 2006, but a surgery in 2014 showed a PCL tear." R. 2174; *compare* R. 2015 (Sept. 2006 MRI), *with* R. 301 (Jan. 2014 surgical notes). This did not end the MI inquiry, however, because Daniel's "right knee was not the basis of the disability finding at the CPD." R. 2174.

The ALJ then compared medical evidence showing the severity of Daniel's mental MDIs in 2007–2010 to medical evidence showing the severity of those MDIs beginning in 2014, *see* R. 2171–74 (citing R. 315–17, 319, 321, 323–34, 1582), which is when DDS determined that Daniel's once-disabling major depression had improved, resulting in an increase in his functional ability, R. 119. Outpatient psychiatric treatment notes from 2014 tended to show that Daniel was calm, made good eye contact, spoke at a normal volume, and had a full affect. R. 315, 317, 319,

321, 323–24. He denied experiencing hallucinations. *See id.* In February 2014, Daniel told his psychiatrist, Hasnain Maqsood, M.D., that he was now "able to ignore his wife and does not get upset anymore." *Id.* (quoting R. 321). Dr. Maqsood noted Daniel was "compliant with his treatment and his condition is improving." R. 321. Daniel initially exhibited "poor" or "decreased" concentration on exams. R. 319, 321. 324. By April 2014, his concentration had improved to "satisfactory." R. 315, 317. Daniel's psychiatrist left the area in or around September 2015. *See* R. 1582. In September 2016, Daniel reported he had "not been under any psychiatric care or medications since that time. He had . . . remained functional until recently when several stressors exacerbate[d] his symptoms." *Id.* Daniel sought help at this time because he "ha[d] begun having visual and auditory hallucinations." *Id.*

Third, ALJ Schueler adequately explained why this comparison actually showed positive changes (improvement) in the symptoms or signs associated with Daniel's preexisting mental MDIs. *See* R. 2173–74. Unlike in 2007–2010, for example, Daniel "had consistently normal speech and good eye contact" during medical visits in 2014. R. 2173. In 2014, he specifically denied having hallucinations. R. 2175. Daniel also reported being able to better control his bipolar/mood disorder in 2014, whereas in 2007–2010 he reported mood instability and feeling like he could explode at any point. *See id.* In 2008, Daniel's counselor observed that he presented as "childlike" and "cognitively impaired." R. 2173. Dr. Maqsood "did not observe any childlike presentation or cognitive impairment" in 2014. *See id.* On the contrary, he routinely noted that Daniel "looked appropriate for his age," expressed "fair insight and judgment into his mental health issues," and demonstrated "satisfactory" fund of knowledge and abstraction ability. R. 315, 317, 319, 321, 324. These findings logically relate to the ALJ's conclusion that mental-health treatment notes from 2014 "show[ed] less severe symptom complaints and objective

findings" than treatment notes from 2007–2010. R. 2171; *see, e.g.*, *Krystal H. v. Saul*, No. 4:19cv5, 2020 WL 5526499, at *4–5 (July 20, 2020); *Latchum*, 2008 WL 3978081, at *3.

Medical improvement is a fairly low bar. *See Latchum*, 2008 WL 3978081, at *2–3; 20 C.F.R. § 404.1594(c)(1) (defining MI as "any decrease in the medical severity" of preexisting impairment(s)). All it requires is "sufficient medical evidence" showing improvement in the symptoms or signs associated with the preexisting impairment(s). *Latchum*, 2008 WL 3978081, at *3. Agency commentary in the MI regulation indicates that such improvement should "be[] sustained long enough to permit a finding of medical improvement," 20 C.F.R. § 404.1594(b)(1) (example 2), but the regulation itself does not contain a duration requirement. *Id.*; *see* R. 2169 (citing 20 C.F.R. § 404.1594(b)(1) (example 2)). Dr. Maqsood's treatment records from February–June 2014 demonstrate actual improvement in most of the psychological signs and symptoms which provided the basis for finding Daniel medically disabled in November 2010. Thus, the ALJ reasonably relied on them in finding any degree of decrease in the medical severity of those impairments. *See Krystal H.*, 2020 WL 5526499, at *4–5; *Latchum* 2008 WL 3978081, at *3.

Daniel objects that ALJ Schueler "consolidate[d] all of [his] mental impairments" into one MI analysis rather than determining MI on an impairment-by-impairment basis. Pl.'s Br. 53. The ALJ acknowledged taking that approach based on his conclusion "the regulations [did] not require that each impairment present at the CPD be evaluated for medical improvement." R. 2168. This conclusion is consistent with the MI regulation's text, 20 C.F.R. § 404.1594(b)(1), and finds some support in Fourth Circuit caselaw, *see, e.g.*, *Wyatt v. Bowen*, No. 89-2943, 1989 WL 117940, at *2 (4th Cir. Sept. 11, 1989) ("[M]edical improvement is any decrease in the medical severity of *any* impairment which was present at the time of the most recent favorable

decision that the claimant was disabled or continued to be disabled." (emphasis added)). Daniel does not point to any legal authority supporting his argument that ALJ Schueler had to establish medical improvement for both his mood disorder/anxiety and his borderline intellectual functioning/learning disorder in order to find that MI occurred by October 6, 2014. *See* Pl.'s Br. 53. Accordingly, I find no error in the ALJ's medical improvement analysis.

*

ALJ Schueler also found that this medical improvement was related to Daniel's ability to work because it resulted in an increased RFC in October 2014, *see* R. 2175 (citing 20 C.F.R. § 404.1594(f)(4)), compared to his "disabling" RFC at the CPD in November 2010, *see* R. 2162–63 (citing 20 C.F.R. § 404.1594(c)(3)(iii)). A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite his or her MDIs, related symptoms, and treatment. SSR 96-8p, 1996 WL 374184, at *2 (emphasis omitted). The "RFC assessment is a holistic and fact-specific evaluation," *Patterson*, 846 F.3d at 659, meant to identify each impairment-related functional limitation supported by the record and to determine the degree each limitation would impact the claimant's ability to sustain gainful employment, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). That assessment should be made on a "function-by-function basis, including the functions listed in" 20 C.F.R. § 404.1545(b)–(d). SSR 96-8p, 1996 WL 374184, at *1. Section 404.1545 lists the physical, mental, and "other" functional abilities that a person might need in order to perform most jobs. *See* 20 C.F.R. § 404.1545(b)–(d). They include the abilities to follow instructions, to "respond[] appropriately to supervision [and] co-workers," and to handle "work pressures in a work setting." *Id.* § 404.1545(c).

In April 2010, DDS reviewer Dr. Sampson opined that the "restrictions resulting from" Daniel's severe major depressive disorder and severe borderline intellectual functioning rendered him "unable to meet the basic mental demands of competitive work on a sustained basis." R. 641 ("[He] would be unable to function in a competitive work environment."). While Dr. Sampson "did not issue a detailed [RFC] at the CPD," R. 2162, her function-by-function assessment, R. 638–40, indicates that Daniel's severe mental MDIs would have prevented him from doing even simple routine tasks within a schedule, handling normal workplace stress, and interacting appropriately with other people, R. 641. *See generally* SSR 85-15, 1985 WL 58657, at *4 (Jan. 1, 1985) ("[T]he basic mental demands of competitive, remunerative, unskilled work include the abilities (on a sustained basis) to understand, remember, and carry out simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting."). When the CPD does not contain an RFC assessment, "either because this assessment is missing from [the] file or because it was not done, [the ALJ] will reconstruct the residual functional capacity" for purposes of determining whether medical improvement is related to the claimant's ability to work. 20 C.F.R. § 404.1594(c)(3)(iii). "This reconstructed [RFC] will accurately and objectively assess [the claimant's] functional capacity to do basic work activities." *Id.* The ALJ's reconstructed RFC finding should represent the "maximum functional capacity consistent with" a conclusion that the claimant was disabled, or continued to be disabled, at the CPD. *Id.*

Here, ALJ Schueler concluded that Daniel's severe physical MDIs present at the CPD would have resulted in an RFC for "light work with the following non-exertional limitations. [He] could occasionally kneel, crawl, and climb. He should have avoided unprotected heights, and he could not use right foot controls." R. 2162; *see also* R. 2175 ("[S]ince October 6, 2014,

the claimant has had the [RFC] to perform light work as defined in 20 CFR 404.1567(b).”).[13]

Daniel’s severe mental MDIs at the CPD rendered him “unable to perform any detailed or

complex work.” *Id.* He was “limited to basic reading and writing. . . . Due to deficient reasoning,

[he] would have been unable to perform even simple, occasional decision-making and would

have been unable to deal with any changes in [the] work setting.” *Id.* He could not have any

“interaction with public or coworkers due to his childlike presentation and cognitive impairment.

He would have been off task more than 10% of the workday on average due to his mental

symptoms.” *Id.* ALJ Schueler based the 10% off-task limitation on Daniel’s “marked

deficiencies in concentration, persistence, or pace caused by significant mood symptoms and

---

[13] “Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.” 20 C.F.R. § 404.1567(b). A person who can meet these strength demands can perform “[t]he full range of light work” only if he or she can also “stand or walk for up to six hours per workday or sit ‘most of the time with some pushing and pulling of arm or leg controls.’” *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); *see* SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983). ALJ Schueler did not assess Daniel’s physical “work-related abilities [at the CPD] on function-by-function basis,” SSR 96-8p, 1996 WL 374184, at *1, and he did not explain how he concluded that Daniel “could actually perform the tasks required by” light work as of November 2010, *Woods*, 888 F.3d at 694. In fact, he failed to cite even a single piece of medical evidence from before the CPD that might support an RFC for light work. *See* R. 2162–63, 2171, 2174–75.

     “This missing analysis is especially troubling because the [CPD] record contains conflicting evidence,” *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015), from Daniel’s examining (if not treating) physicians about how his torn right PCL and chronic right knee pain with instability limited his exertional capacities from August 2006 through September 2008. *Compare* R. 1777–78 (Dr. Miller’s medical opinion that Daniel’s “inoperable [right] PCL tear [with] chronic pain,” instability, and swelling limited him to standing/walking for “2 hours in an 8-hour workday” from August 27, 2006 through September 8, 2008), *with* R. 1795–98 (Dr. Esteban’s medical opinion that Daniel’s “non-operative right PCL” did not affect his standing/walking at all from August 27, 2006 through September 16, 2008). ALJ Schueler did not mention these medical opinions anywhere in his decision. R. 2162–64, 2168–71, 2173–88. This clear legal error, 20 C.F.R. § 404.1527(c); *cf. Dowling*, 986 F.3d at 384 (“The ALJ was required to do more than simply acknowledge the existence of [the] opinion.”), undermines my confidence in whether the ALJ’s “reconstructed” RFC for light work truly represents an “accurate[] and objective[]” assessment of Daniel’s “maximum” physical capacities at the CPD in November 2010, 20 C.F.R. § 404.1594(c)(3)(iii). Daniel’s arguments against the ALJ’s medical improvement analysis do not mention the ALJ’s failure to weigh each medical opinion as § 404.1527(c) so clearly required. *See* Pl.’s Br. 49–58. Accordingly, I do not consider this legal error to be an independent reason why the Commissioner’s final decision should be reversed and remanded.

hallucinations" in 2007–2010. *See* R. 2175 ("A person experiencing severe mood swings and anger or hallucinations would likely fall off task at work or need to take breaks to deal with such symptoms.").

The ALJ found that the medical improvement in Daniel's severe mental MDIs resulted in an increased mental RFC by October 6, 2014. *See* R. 2174–75. He explained that Daniel "no longer complained of hallucinations, significant mood swings, or anger problems due to his bipolar/mood disorder. Consequently, he no longer had marked limitation in concentration, persistence or pace, and he would not need over 10% time off task to deal with such symptoms." R. 2175. "Additionally," the fact that Daniel "no longer presented as childlike or had problems with reality testing" by October 2014 meant that he "would be able to make simple-work related decisions and interact with coworkers and the public occasionally." *Id.* Daniel's once-disabling mental MDIs, *see* R. 2162–63, now caused only "moderate" limitations in the broad functional areas, *see* R. 2165–66. R. 2175; *see also* R. 2173–74 ("Dr. Leizer reviewed the recent evidence [in September 2014] and opined the claimant would only have moderate limitations [with] concentration, persistence, and pace and that he would be able to perform simple work with occasional interaction with the public. These are the main work-related medical improvements [Daniel] experienced near the cessation date.").

The ALJ found that "since October 6, 2014," Daniel's severe mental MDIs now limited him to "simple, routine, repetitive tasks, in a low-stress job (defined as having only occasional decision making or change in the work setting), no[] production rate of pace work such as assembly line work/strict production quotas, and occasional[] interaction with the public, co-workers, or supervisors." R. 2175. Daniel does not challenge the ALJ's finding that medical improvement relates to his ability to work insofar as documented improvement in Daniel's

hallucinations, mood swings, anger problems, and "childlike" presentation increased his capacities to stay on task, deal with ordinary work stress, and interact with people. *See generally* Pl.'s Br. 48–58; *see also id.* at 59–69 (arguing that the ALJ failed to explain why Daniel's new mental RFC, R. 2175, accommodated his now "moderate" limitations maintaining concentration, persistence, or pace and interacting with other people, R. 2162). That finding is supported by the record, including Dr. Leizer's medical opinion.

### 2. Daniel's Current Physical MDIs & RFC

ALJ Schueler's "determination that medical improvement related to [Daniel's] ability to do work has occurred does not, necessarily, mean that [his] disability will be found to have ended." 20 C.F.R. § 404.1594(b)(3). The Commissioner "must also show that [Daniel is] currently able to engage in substantial gainful activity before [the ALJ] can find that [he is] no longer disabled." *Id.* § 404.1594(a). In making this determination, ALJ Schueler was required to "consider" and make factual findings about the nature, severity, and functionally limiting effects of *all* Daniel's "current [medically determinable] impairments, not just th[e] impairment(s) present" in November 2010. *See id.* § 404.1594(b)(5), (f)(6)–(7).

ALJ Schuler did not follow these regulatory requirements when evaluating Daniel's current physical impairments—most notably his right knee status-post PCL surgery in January 2014.[14] Indeed, despite recognizing that "surgery in 2014 showed [a] PCL tear," which had been misdiagnosed "as a PCL strain in 2006," R. 2174; *see* R. 301, 2015, the ALJ did not even find that Daniel had an MDI affecting the tendons in his right knee, *see* R. 2162, 2188. He merely found that Daniel's "degenerative joint disease of the knees" was a severe MDI at the CPD in November 2010, R. 2162, and that this MDI continued to be "severe" after October 6, 2014, R.

---

[14] Accordingly, I do not address Daniel's RFC challenge related to his current mental impairments.

2188. In clinical settings, Daniel and his treating physicians repeatedly attributed his knee

symptoms and reported functional limitations to the torn PCL and subsequent surgery, not to

degenerative changes in the knee joint. *See, e.g.*, R. 306, 308, 310–11, 312–13 (Dr. Weidman,

Jan., Feb. & Mar. 2014); R. 642–43 (Daniel, Aug. 2007); R. 539–40 (Daniel, Jan. 2015); R. 550–

61 (Dr. Farmer, Feb. 2016); R. 662–63 (Daniel, Mar. 2010); R. 1442 (Dr. Farmer, June 2016); R.

1571–72 (Daniel, Nov. 2015); R. 1778–80 (Dr. Miller, Sept. 2008); R. 1929–30 (Daniel, Oct.

2019); R. 1981 (Dr. Esteban, Nov. 2006). Before the agency, Daniel testified consistently that

chronic right knee pain and PCL instability severely restricted his abilities to sit and stand/walk

throughout the day. *See, e.g*., R. 251–56 (Jan. 2015 function report); R. 85–86, 96, 98–99, 101–

02 (Apr. 2016 testimony); R. 733–34 (July 2020 testimony); R. 2223–26 (July 2022 testimony).

The ALJ's failure to find any MDI (severe or non-severe) related to Daniel's torn PCL casts

doubt on whether he actually considered this objective abnormality to be "an independent source

of [Daniel's] musculoskeletal pain when weighing the subjective evidence of [Daniel's] pain-

related functional limitations." *Woody N. v. Berryhill*, No. 4:17cv44, 2018 WL 10806836, at *6

(W.D. Va. Aug. 22, 2018). That evidence was crucial to a proper exertional RFC determination

in Daniel's case.

  Nonetheless, the ALJ did acknowledge that Daniel underwent treatment for the injured

PCL throughout the relevant time, R. 2171 (Aug. 2006 to Dec. 2008); R. 2174 (Jan. 2014); R.

2178–79 (Feb. 2016 to Oct. 2019), and that Daniel "alleged continuing disability" in part

because knee pain severely limited his capacities to sit, stand, walk, and complete many daily

activities, R. 2176–76 (citing R. 232, 238, 84–98, 101–03, 733–34, 2204). He also discounted

two DDS physicians' medical opinions that Daniel could do "medium exertional work with

frequent postural activities," R. 2186 (citing R. 438–39, 464–65), because they did not have the

chance to "support their opinions with the most recent evidence." *Id.* In September 2014 and

March 2015, the DDS physicians opined that Daniel's knee pain status-post January 2014

arthroscopic surgery would allow him "to perform the tasks required by 'medium work,' such as

lifting up to 50 pounds at a time, frequently lifting or carrying up to 25 pounds, [and] standing or

walking for six hours" in an eight-hour workday, *Woods*, 888 F.3d at 694 (citing SSR 83-10,

1983 WL 31251, at *6 (Jan. 1, 1983)). *See* R. 438–39, 464–65. The ALJ did not identify any

"recent" evidence that he thought undermined the DDS medical opinions. *See generally* R. 2162,

2171, 2174–79, 2186–88. The ALJ's own RFC assessment indicates that Daniel's knee pain and

surgery played some role in his decision to craft a more restrictive RFC. *See* R. 2186.

The ALJ "limited [Daniel] to light exertional work and only occasionally climbing

ramps, kneeling, or crawling and no ladder, rope, or scaffold climbing or right foot control

operations, which [he found] more consistent with the medical evidence of record showing

[Daniel's] complaints of knee and joint pain, history of knee surgery, and mild obesity." R. 2186;

*accord* R. 2175 (citing 20 C.F.R. § 404.1567(b)). For our purposes, the only difference between

the DDS physicians' opinions for "medium work" and the ALJ's RFC for "light work" is the

amount of weight that Daniel must be able to lift and/or carry on a regular and continuing basis.

20 C.F.R. § 404.1567(b)–(c). Both exertional levels of work "require[] standing or walking, off

and on, for [about] 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6. The ALJ

did not cite any "medical evidence of record" that he found "consistent" with an RFC for light

work, let alone "more consistent" than an RFC for medium work. R. 2175.

Daniel's 2,7000-page record contains reams of "medical evidence" related to his knee

problems. Much of this evidence shows that Daniel frequently reported chronic knee pain with

laxity, R. 306, 308, 311–312, 508, 556, 560, 1442, 1571, 1930, 2066; exhibited abnormal gait or

trouble walking, R. 502, 642, 663, 1571, 1930, 1999; had moderate muscle atrophy, reduced

range of motion, swelling, and/or tenderness in the right lower extremity, R. 306, 308, 311, 508,

1930; and had "obvious" PCL instability even after surgery, R. 560; *see also* R. 311, 313, 539.

Other physical exams revealed no abnormalities in these areas. *See., e.g.*, R. 349, 1578, 1583,

556–57, 1442, 2066–67, 2081–82. The ALJ mentioned some of this conflicting medical evidence

in his summary of the post-2014 medical records, R. 2178–79, but his RFC analysis does not

identify what evidence he actually "found credible, useful, and consistent," *Woods*, 888 F.3d at

694, with his conclusion that Daniel could do light work with some postural limitations to

accommodate his knee pain.

Thus, the ALJ's decision lacks *both* the required narrative discussion describing how

specific medical facts and other relevant evidence support each RFC finding *and* a logical

explanation "how he concluded—*based on this evidence*—that [Daniel] could actually perform

the tasks required by" light work, including lifting up to twenty pounds, frequently lifting ten

pounds, and standing and/or walking for six hours in an eight-hour workday. *See Woods*, 888

F.3d at 694. In fact, ALJ Schuler did not even acknowledge those exertional demands. *See* R.

2186–87. He simply found that Daniel could do light work as defined in the regulations, R. 2175;

*see also* R. 2162, without "engaging in a function-by-function analysis" how his MDIs limited

his abilities to lift, carry, sit, stand, or walk during an eight-hour workday, five days a week.

*Dowling*, 986 F.3d at 388 (cleaned up). These clear legal errors preclude meaningful judicial

review.

Finally, ALJ Schueler did not properly evaluate Daniel's testimony describing the

intensity, persistence, and functional effects of his chronic knee pain as part of his physical RFC

assessment. *See* R. 2186–87; 20 C.F.R. § 404.1529. Although ALJ Schueler did not expressly

find an MDI related to Daniel's torn PCL status-post surgery, he correctly recognized that this MDI appeared throughout the medical record, and he found that Daniel had a "severe" MDI affecting his bilateral knees. Those findings (and omissions) inform the ALJ's approach to evaluating Daniel's statements describing how his knee pain and other symptoms affected his ability to work during the relevant time. *See* 20 C.F.R. § 404.1529.

The ALJ found that Daniel's MDIs could reasonably be expected to cause his alleged symptoms "since October 6, 2014," *see* R. 2175, 2186, presumably including the chronic severe knee pain that Daniel had described at ALJ hearings in April 2016, July 2020, and July 2022, *see* R. 2176–77. But, he concluded that Daniel's statements describing the intensity, persistence, and functionally limiting effects of those symptoms were "not entirely consistent with the objective medical and other evidence for the reasons explained in [his] decision," R. 2186. The ALJ gave two reasons to support that conclusion. *See* R. 2186–87.

First, Daniel "often went for months or over a year without significant treatment for [his mental] impairments," and he was 'usually mentally stable and had relatively controlled [psychiatric] symptoms when he was medicated and often for some time after." R. 2187 ("A common pattern in his mental health treatment shows that he complains of hallucinations, mood swings, and increased mental symptoms after being off of medications for some time, then he gets treatment. He quickly reports improvement and continues medications for a few months, then he quits going to treatment."). Second, Daniel "alleged that he had not worked since 2018 primarily due to his carpal tunnel symptoms," his own description of his physical activities, like "helping to take care of [his] family," "work[ing] as a mechanic[,] and doing odd jobs in 2019 and 2020, . . . shows that [he] is capable of doing light activities, i.e., mechanic work, and that he does more than he has alleged." *Id.*

41

"The first reason has nothing to do with pain." *Mascio*, 780 F.3d at 639. The second is related to pain, but it focuses more on Daniel's carpal tunnel symptoms in and after 2018 than his severe chronic knee pain and instability that had been present throughout the longitudinal period. *See* R. 2187. Moreover, the ALJ's findings describe "the *type* of activities [that Daniel] could perform without also [acknowledging] the *extent* to which [he] can perform them," *Woods*, 888 F.3d at 694. This is legal error. *See id.*

In April 2016, Daniel testified he "did a little bit of work" on other people's cars to help cover his family's bills in 2014, but "it wasn't much of anything." R. 84. He worked "maybe a couple days a week" on a schedule that he described as "ten minutes on, ten minutes off." R. 98. Knee pain forced him to take breaks. Even on that flexible schedule, most of his repair jobs took 30 to 90 minutes to complete. R. 811. He testified that he "more or less quit doing anything [in 2015] because" the ruptured PCL in his right knee hurt so badly, R. 86; *see also* R. 85–86, 88– 89, 96–98, but his tax returns show self-employment earnings through 2018. Daniel did keep doing some small-engine repair out of his home garage in 2016–2018. These jobs did not require Daniel to lift heavy objects or stand/walk for extended periods of time, and he had the flexibility to take a break whenever his pain got too bad to continue working. *See* R. 811, 1295–98. ALJ Schueler did not explain how any of the activities that Daniel described in his testimony show that he physically "does more than he has alleged," R. 2187. *See Hines*, 453 F.3d at 566. Even if he had, Daniel's ability to do some light "mechanic work" here and there, on his own schedule and at his own pace, would not support the ALJ's conclusion that Daniel has been able to do light exertion work for eight hours a day, five days a week, from October 6, 2014, through July 28, 2022. *See* R. 2175, 2187, 2190.

## V. Conclusion

42

For the foregoing reasons, I respectfully recommend that the presiding District Judge

**GRANT** Daniel's motion for summary judgment, ECF No. 16, in part with respect to the SGA

analysis and the physical RFC analysis for the period since October 6, 2014, and **DENY** it in part

with respect to the medical improvement analysis; **DENY** the Commissioner's motion for

summary judgment, ECF No. 23; **REVERSE** the Commissioner's final decision dated July 28,

2022; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this

case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and
Recommendation], any party may serve and file written objections to such
proposed findings and recommendations as provided by rules of court. A judge of
the court shall make a de novo determination of those portions of the report or
specified proposed findings or recommendations to which objection is made. A
judge of the court may accept, reject, or modify, in whole or in part, the findings
or recommendations made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations

within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is

directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall serve certified copies of this Report and Recommendation on all counsel

of record.

ENTER: February 21, 2024

Joel C. Hoppe
United States Magistrate Judge